The undersigned have reviewed the award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some modifications.
Plaintiff has filed a motion to receive additional evidence into the record as to events subsequent to the filing of the Opinion and Award by Deputy Commissioner Glenn. Plaintiff's motion is, in the discretion of the undersigned, HEREBY DENIED. Plaintiff may properly file a new Form 33 Request for Hearing at the conclusion of this matter in order to obtain a full evidentiary hearing on the merits by a deputy commissioner on the asserted change of condition.
The Full Commission, in their discretion have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
***********
Accordingly, the undersigned find as facts and conclude as matters of law the following, which were entered into by the parties as an executed Pre-Trial Agreement, as
 STIPULATIONS
1. All the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times herein.
3. Key Risk Management Services was the carrier on the risk for workers' compensation coverage on November 30, 1993 and on January 20, 1994. E.B.I. was the carrier on the risk for workers' compensation coverage on May 24, 1995.
4. Plaintiff's average weekly wages at the time of the original injury will be determined from a Form 22.
5. Plaintiff sustained an injury to her back which occurred in the course and scope of her employment with defendant-employer on November 30, 1993.
6. Defendants have paid temporary total disability benefits to plaintiff as a result of her admittedly compensable injury of November 30, 1993, from January 24, 1994 through July 11, 1994, and from July 20, 1994 through October 20, 1995. Defendants have paid temporary partial disability benefits from October 21, 1995 through October 27, 1995.
7. The issues to be determined are as follows:
 a) Did plaintiff sustain any new injuries, either on January 20, 1994 or May 24, 1995, that arose out of her employment with defendant-employer?
 b) What is plaintiff's disability rating to her back as a result of any compensable injuries she sustained while in the course and scope of her employment with defendant-employer?
 c) Is plaintiff permanently and totally disabled as a result of the injuries she sustained while in the course and scope of her employment with defendant-employer?
 d) Is plaintiff's depression and attempted suicide the direct result of her compensable injuries?
e) What benefits, if any, is plaintiff entitled to receive?
***********
The Pre-Trial Agreement along with its attachments and stipulations contained therein are hereby incorporated by reference as though fully set out herein.
***********
Based upon all of the competent, credible, and convincing evidence adduced at the initial hearing and based upon the record, the undersigned make the following additional
 FINDINGS OF FACT
1. At the time of initial hearing, plaintiff was a forty-four year old female. She had completed the seventh grade and had obtained a nurse's assistant certificate. Plaintiff had polio as a child, and she had undergone a number of surgeries prior to her sixteenth birthday.
2. Prior to beginning work for defendant-employer, plaintiff worked as an in-home aide and as a certified nursing assistant.
3. Plaintiff became employed by defendant-employer in July 1993. In her position, she assisted the patients with their daily needs such as bathing and dressing. On or about November 30, 1993, plaintiff was assisting a patient to the bathroom when she slipped and fell, injuring her back.
4. Following her injury, the parties entered into a Form 21 Agreement dated January 13, 1994, wherein defendants admitted that plaintiff sustained an injury to her back on November 30, 1993, while in the course and scope of her employment with defendant-employer. The parties agreed that plaintiff's average weekly wage was $206.25, yielding a compensation rate of $137.50 per week. The parties also agreed that plaintiff was temporary totally disabled and that benefits would be paid to plaintiff starting December 23, 1993, at the rate of $137.50 per week, for the necessary weeks. The Form 21 Agreement was approved by the Industrial Commission on February 7, 1994.
5. Plaintiff returned to work from her November 30, 1993, injury on or about January 17, 1994.
6. On January 20, 1994, plaintiff was assisting a patient with a bath when she slipped in the shower, falling and striking her back, shoulder area, and head. The hall nurse discovered plaintiff shortly after the fall. That nurse found plaintiff's supervisor and told her that plaintiff had fallen and injured herself. Plaintiff was initially seen and treated by Dr. Stephen Fleming for her January 20, 1994, fall. Dr. Fleming treated plaintiff's condition with epidural injections and physical therapy. When plaintiff did not respond to his course of treatment, Dr. Fleming referred her to Dr. David Kelly.
7. Dr. Kelly diagnosed plaintiff's condition as degenerative disc disease and a bulging lumbar disc, but he did not find a ruptured disc. Dr. Kelly determined that plaintiff did not need surgery to correct her injury, but rather she should be treated with conservative means. Plaintiff was sent to Dr. Alfred L. Rhyne for a second opinion. Dr. Rhyne agreed with Dr. Kelly that plaintiff did not need surgery and that she should be treated with conservative means.
8. Dr. Fleming then referred plaintiff to Dr. Andrea Stutesman, a physical medicine rehabilitation specialist, for physical therapy and work rehabilitation. When plaintiff began her physical therapy program, it aggravated and caused her condition to deteriorate. Dr. Stutesman noted plaintiff's consistent and increasing complaints about her bladder and pain. Dr. Stutesman thought that the problems may be caused by spinal cord compression. Therefore, Dr. Stutesman referred plaintiff to Dr. Mark Anderson, a urologist.
9. Dr. Anderson diagnosed plaintiff's condition as neurogenic bladder dysfunction. It was Dr. Anderson's opinion that plaintiff's neurogenic bladder dysfunction was caused by spinal cord or nerve compression.
10. Dr. Stutesman also referred plaintiff to Dr. Charles E. Rawlings, III, a neurosurgeon. Upon examination, Dr. Rawlings found plaintiff to have a fair amount of neurological deficits, primarily from her polio. But an MRI showed a possible ruptured disc at T7-8. He followed the MRI with a myelogram and CT scan, which showed a T7-8 herniated disc and a T8-9 herniated disc, causing spinal cord compression.
11. On March 7, 1995, Dr. Rawlings performed T7-8 and T8-9 laminectomies, with transpedicular decompression and removal of ruptured disc material. Prior to this operation, plaintiff was losing her ability to control her bladder. After the operation, her condition improved substantially.
12. It was Dr. Rawlings' opinion that plaintiff's ruptured discs at T7-8 and T8-9 were not related to her polio, but rather were the result of her fall of January 20, 1994. The undersigned accept his opinion on causation as credible and convincing. Dr. Rawlings released plaintiff from his care on November 13, 1995, with a forty percent (40%) permanent partial disability rating to her back.
13. Plaintiff returned to work in the activities assistant position on October 21, 1995. In this position plaintiff was coordinating various activities for the patients. This position was a real position and was not "make work". She gradually increased her hours until she was back working eight hours a day by October 27, 1995. She started to work full time, but voluntarily and due to her own personal choice, she switched to part-time in November of 1996. Plaintiff returned to work earning the same wages ($5.50 per hour) as she was making when she was initially injured and thus re-gained her pre-injury wage-earning capacity. Plaintiff continued to work in this position until she was fired by defendant. However, plaintiff was re-instated after a week.
14. Dr. Rawlings was of the opinion that plaintiff was able to perform the position of activities assistant. Dr. Stutesman also felt that plaintiff could perform the position of activities assistant. However, while Dr. Stutesman felt that she could not lift any patients and could do no bending or squatting, she felt plaintiff could work up to 40 hours per week within her restrictions. The undersigned accept these opinions as credible and convincing.
15. On May 24, 1995, plaintiff attempted suicide by taking an overdose of medication. She indicated that she was compelled to attempt suicide because she had been told by Kim McQueen, plaintiff's rehabilitation case manager, to take her life.
16. Dr. David Branyon, a psychiatrist, treated plaintiff following her attempted suicide. Dr. Branyon diagnosed plaintiff's condition as severe depression. It was his opinion that plaintiff's depression was brought on by the different pressures in her life. He further indicated that plaintiff's injuries, surgery and rehabilitation were significant contributing factors to her severe depression. It was his further opinion that plaintiff had a lot of guilt because she was not able to recover from her injuries and to return to her position. He felt that she had transferred her guilt to Ms. McQueen and to her treating physicians. He felt that her transferred guilt explained why she was saying that Ms. McQueen had told her to take her life. It should be noted that this way of thinking, too, was a result of the stress that had been generated by her injuries and inability to return to work. The undersigned accept the treating psychiatrist's opinion as fact and as credible and convincing.
17. All of plaintiff's treating physicians were of the opinion that she could perform the position of activities assistant and that this was a job that defendant-employer had that was offered to the public. The undersigned accept these opinions as credible and convincing. However, Dr. Gary Sigmon, vocational consultant, was of the opinion that plaintiff, due to all of her disabilities, is not now employable in any position that is offered to the working public. The undersigned do not find this opinion as credible as of the date of initial hearing as plaintiff continues to work in the job that was offered to the public. However, this finding does not preclude a future change of condition issue should plaintiff's earning capacity change.
18. Dr. Stutesman gave plaintiff a ten percent (10%) permanent partial disability rating to her back. More weight will be given to the opinion of Dr. Rawlings in that he was the treating physician for this condition, and this is his area of specialty. However, Dr. Stutesman's opinion will be considered in determining a proper rating to be awarded.
19. Plaintiff will continue to need medical treatment for her pain associated with her back condition and will continue to need treatment for her psychological problems stemming from her injuries.
***********
Based upon the foregoing stipulations and findings of fact, the undersigned make the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer when she fell on January 20, 1994.
2. Plaintiff's suicide attempt of May 24, 1995, was the direct result of the injuries and the treatment flowing from her January 20, 1994, injury by accident.
3. Plaintiff was able to return to work full time. However, she chose to return on a part-time basis, and she was working at the time of the initial hearing. Plaintiff is not permanently totally disabled at this time. G.S. § 97-29.
4. Plaintiff's average weekly wage was $206.25 per week, yielding a compensation rate of $137.50. G.S. § 97-2(5).
5. As a result of the injury by accident, plaintiff is entitled to temporary total disability compensation in the amount of $137.50 per week for her period of temporary total disability from the date of injury through October 25, 1995. She is entitled to temporary partial disability from October 21, 1995 through October 27, 1995 at which time she returned to work full time earning the same wages she did at the time of her injury. Plaintiff is not entitled to temporary partial disability compensation due to her voluntary reduction of hours which was not the result of her compensable injury and which occurred after November of 1996. G.S. § 97-30.
6. As a result of the injury by accident, plaintiff has sustained a twenty-five percent (25%) permanent partial disability to her back, and she is entitled to be compensated for the same. G.S. § 97-31.
7. Plaintiff is entitled to the payment of the medical expenses incurred for the treatment of the injuries she sustained, and to any further medical treatment that tends to effect a cure, give relief and/or lessen plaintiff's period of disability. G.S. §97-2(19).
8. Plaintiff is in need of ongoing medical treatment for her pain and psychological problems, and she is entitled to receive this treatment until her treating physicians indicate otherwise. G.S. § 97-25.
***********
The foregoing findings of fact and conclusions of law engender the following
 AWARD
1. Subject to attorney's fees hereinafter awarded, defendants shall pay to plaintiff temporary total disability benefits at the rate of $137.50 per week from January 20, 1994 through October 20, 1995 and for temporary partial disability from October 21 — October 27, 1995. All accrued compensation shall be paid in one lump sum. Defendants shall be given credit for all benefits already paid.
2. Subject to attorney's fees hereinafter awarded, defendants shall pay to plaintiff compensation at a rate of $137.50 per week for 120 weeks for the twenty-five percent (25%) permanent partial disability to plaintiff's back.
3. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury, when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments, and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability. This award includes treatment for her psychological condition flowing from her injuries.
4. An attorney's fee of twenty-five percent (25%) of the compensation due plaintiff is hereby awarded to plaintiff's counsel as a reasonable attorney's fee and shall be deducted and paid directly to plaintiff's attorney.
5. Defendants shall pay the costs of this action.
IT IS FURTHER ORDERED that this case be removed from the Full Commission hearing docket.
This the ___ day of _________, 1999.
 S/_____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
JHB:kws